FILED & ENTERED

JUN 28 2024

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY sumlin     DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>George Gordon Strong, III,<br><br><br><br><br><br>Debtor. | Case No.:    2:22-bk-13069-NB<br><br>Chapter:    13<br><br>**MEMORANDUM DECISION DENYING CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN**<br><br><u>Preliminary Evidentiary Hearing</u>:<br>Date:  February 6, 2024<br>Time:  11:00  a.m.<br><br><u>Continued Evidentiary Hearing</u>:<br>Date:  February 12, 2024<br>Time: 9:30 a.m.<br><br><u>Continued Confirmation Hearing</u>:<br>Date:  March 14, 2024<br>Time: 9:30 a.m.<br>Place: Courtroom 1545<br>            255 E. Temple Street<br>            Los Angeles, CA 90012 |

This Bankruptcy Court conducted evidentiary hearings to determine whether to confirm Debtor's chapter 13 Plan as set forth in the caption above.  For the reasons set forth on the record at the above-captioned Confirmation Hearing,[1] and explained in more detail in this Memorandum Decision, separate orders have been issued

---

[1] Determinations made on the record at the Confirmation Hearing are incorporated herein as permitted by Rule 52(a) (Fed. R. Civ. P.), made applicable by Rules 7052 and 9014(c) (Fed. R. Bankr. P.).

(a) denying confirmation of the Plan (dkt. 192) and (b) converting this case to chapter 7 (dkt. 193).

## 1. BACKGROUND

Debtor filed a voluntary chapter 13 petition on June 1, 2022 (the "Petition Date"). Debtor works as an investment advisor and conducts business through a firm he founded in 2009, Strong Wealth Management.[2]  The filing of the petition was precipitated by disputes between Debtor and some former clients, in particular Michael Horner (with affiliates, the "Horners") and David Vosicher (collectively, "Creditors").

Before the Petition Date, the Horners commenced litigation[3] against Debtor in the Superior Court of California for the County of Los Angeles (the "State Court") on May 11, 2021, by filing a complaint asserting claims for fraud, breach of fiduciary duty, negligence, breach of contract, and financial elder abuse.[4]  On June 16, 2022, this Court granted relief from the automatic stay, to enable the Horners to proceed to final judgment in the State Court litigation.[5]  On August 18, 2023, the State Court entered a Final Statement of Decision against Debtor and in favor of the Horners, in which it awarded the Horners compensatory damages of $2,599,120 and double damages of $5,198,240, based on a finding of financial elder abuse, for a total award of $7,797,360[6] (the "State Court Judgment").[7]  In its Final Statement of Decision, the State Court found that Debtor's actions in managing the Horners' investments were "grossly incompetent

---

[2] Aug. 15, 2022 Rule 2004 Examination Tr. at p. 9:16–23.
[3] The action was brought by Mr. Horner and Thomas Horner, in their capacities as co-trustees of the Horner Family Trust.  For ease of reference, this Memorandum Decision does not distinguish between Michael Horner, Thomas Horner, and the Horner Family Trust, instead referring to them as "the Horners."
[4] Dkt. 16, Ex. 1.
[5] Dkt. 32.
[6] In a Proof of Claim filed on June 14, 2022 prior to issuance of the State Court Judgment (Claim 5-1), the Horners asserted that Debtor owed them no less than $11,971,617.90.  The difference between the amount asserted in the Horners' Proof of Claim and the amount set forth in the State Court Judgment is primarily attributable to the fact that the State Court awarded only double damages on account of the Horners' elder abuse claim, as opposed to the treble damages sought by the Horners.  *See* Final Statement of Decision (attached as an exhibit to Horners' Ex. AJ) at p. 12 ("However, based on the evidence presented, primarily that Mr. Horner was not targeted because of his age and that Defendant [Debtor] did not benefit in any way from financial elder abuse, the Court finds treble damages excessive. The Court awards double damages ….").
[7] Horners' Ex. AJ (Debtor's motion to vacate State Court Judgment attaching Final Statement of Decision as an exhibit).

and fell below what would be reasonably expected of a professional in the field,"[8] and involved "manic, voluminous trading patterns" conducted in "blatant disregard" of Mr. Horner's investment objectives.[9]

Debtor's appeal of the State Court Judgment is pending.  In addition, the Horners have filed an adversary proceeding seeking a determination that the State Court Judgment is nondischargeable.[10]  Due in large part to the ongoing State Court proceedings, the nondischargeability action has been quiescent.

On November 13, 2021, Mr. Vosicher filed a claim against Debtor before the Financial Industry Regulatory Authority ("FINRA," and Mr. Vosicher's claim, the "FINRA Claim").[11]  On March 16, 2023, this Court granted relief from the automatic stay, to enable Mr. Vosicher to liquidate the FINRA Claim.[12]  On September 17, 2023, a FINRA arbitration panel awarded Mr. Vosicher $150,000 in compensatory damages.[13]

Debtor's operative First Amended Chapter 13 Plan (the "Plan")[14] proposed to pay creditors an estimated total of $14,980.00 over 36 months.[15]  The bulk of the Plan's payments – $10,990.00 – were earmarked for the priority claim of the Internal Revenue Service.[16]  Debtor proposed to pay general unsecured creditors – who consist primarily of the Horners and Mr. Vosicher – a dividend of 0.02% (that is, a dividend of two basis points).[17]  Funding for the Plan was at least nominally derived from Debtor's projected earnings as a financial advisor, but those earnings were not necessarily reliable so the Plan's proposed dividend to creditors mostly relied on promised contributions to be gifted from Debtor's father, George Gordon Strong Sr.  After Creditors' initial objections,

---

[8] Final Statement of Decision at p. 8.
[9] *Id.* at p. 13.
[10] Adv. No. 2:23-ap-01359-NB.
[11] Dkt. 100, Ex. 1.
[12] Dkt. 111.
[13] Exhibit to Proof of Claim 18-2.
[14] Dkt. 158.
[15] Plan at § I.A.
[16] *Id.* at § II.B.
[17] *Id.* at § I.B.

1  Debtor's father deposited $32,047.29 into a bank account that was dedicated solely to

2  making payments necessary to fund the Plan.[18]

3  **2. CONTENTIONS OF THE PARTIES**

4    Creditors essentially asserted three objections to Debtor's Plan.  First, they

5  asserted that Debtor is ineligible to be a chapter 13 debtor under § 109(e),[19] because

6  Debtor's income from his investment advisory business is not sufficiently reliable and

7  because (at least before Debtor's father deposited funds in a dedicated account to fund

8  the Plan) there was no guarantee that Debtor's father would follow through on his

9  commitment to make up for any shortfalls.  Second, they argued that the Plan does not

10  meet the feasibility requirement imposed by § 1325(a)(6) for the same reasons.  Finally,

11  they contended that Debtor' Plan was not "proposed in good faith and not by any means

12  forbidden by law," as required by § 1325(a)(3), because (A) he failed promptly to furnish

13  required financial information to Creditors and (B) the financial information that he

14  belatedly produced contained material discrepancies that Debtor never satisfactorily

15  explained.  Debtor vigorously disputed each of these contentions.

16  **3. CONFIRMATION PROCEEDINGS**

17    On November 13, 2023, this Court entered an order establishing procedures

18  governing the confirmation hearing (the "Confirmation Procedures Order").[20]  That order

19  provided for direct testimony by declaration, subject to live cross-examination and

20

21

22

23

24

25

26  _____

[18] Decl. of George Gordon Strong Sr. (dkt. 174) at ¶ 5 and Ex. B.

27  [19] Unless the context suggests otherwise, a "chapter" or "section" ("§") refers to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code"), a "Rule" means the Federal Rules of Bankruptcy Procedure or other federal or local rule, and other terms have the meanings provided in the Code, Rules,

28  and the parties' filed papers.

[20] Dkt. 168.

1  redirect.[21]  Live testimony was taken at the Preliminary Evidentiary Hearing (defined in

2  the caption above) and at the Continued Evidentiary Hearing (same).[22]

3  **4. JURISDICTION, AUTHORITY, AND VENUE**

4  This Court has jurisdiction (28 U.S.C. § 1334(b)); the matters at issue are

5  statutorily "core" (28 U.S.C. § 157(a)(2)(L)); and this Court has the authority under the

---

7  [21] The Confirmation Procedures Order also mandated that Debtor include in any confirmed Plan a
8  "disputed claims reserve," and the order includes a detailed explanation of how such a reserve should
   operate, quoted below with subsequent clarifications to assure completeness of the record:

9       A disputed claims reserve means a reserve sufficient to pay disputed claims of
   creditors the *full dollar amount that they would have been receiving if their claim had*
10  *been finally allowed in full prior to confirmation of the Plan*, or such different dollar amount
   as this Court determines to be sufficient to protect that creditor's rights to its aliquot share
11  of distributions.
        For example, if creditor X asserts a claim of $1 million, and if Debtor's Plan were
12  to propose a 10% total dividend broken down into equal distributions over 60 months
   (*i.e.,* 10% ÷ 60 = 1/6 of 1% per month), then each month Debtor would set aside 1/6 of
13  1% of $1 million ($16,666.67) into a disputed claims reserve account held for the benefit
   of creditor X. If creditor X's claim were [at the end of the first month post-confirmation]
14  allowed at 1/10th of the asserted amount ($100,000.00), then creditor X would receive [its
   aliquot share of] funds out of the disputed claims reserve up to 1/10th of its initial claim
15  ($1,666.67 [per elapsed month – *i.e.,* in this example one month]) and the balance
   (which, if that reserve were fully funded, would be $16,666.67 - $1,666.67 = $15,000.00)
16  would be distributed to other creditors in proportion to their allowed claims. Conversely, if
   creditor X's claim were to be ultimately allowed in a greater dollar amount than originally
17  stated (*e.g.,* if it were finally allowed at $2 million), there would be a shortfall and not only
   would creditor X be entitled to 100% of the balance of funds in the disputed claims
18  reserve but, in addition, creditor X would be entitled to most or all of the remaining
   distributions under the Plan until creditor X had caught up (*i.e.,* other creditors would
19  receive $-0- each month until creditor X had caught up).  [Confirmation Procedures Order
   at 2:21–3:7 (as clarified by Adopted Tentative Ruling for Preliminary Evidentiary
20  Hearing).]

21  [22] Debtor called Sonia Singh, one of the attorneys for the Horners, as a percipient witness at the
   evidentiary hearings.  At the outset of the Preliminary Evidentiary Hearing, Debtor made an oral motion to
22  exclude Ms. Singh from the courtroom while other witnesses were testifying pursuing to Rule 615 (Fed. R.
   Evid.).  This Court denied that motion.
23      "Federal Rule of Evidence 615 generally provides that at the request of a party a district court
   shall, or on its own motion the district court may, order witnesses excluded from the courtroom so that
24  they cannot hear the testimony of other witnesses. However, this exclusionary rule is subject to four
   exceptions, the third of which excepts from exclusion 'a person whose presence is shown by a party to be
25  essential to the presentation of the party's cause.'  Thus, where a particular trial counsel is 'essential to
   the presentation' of the client's cause, we agree with the Eighth Circuit that 'Fed.R.Evid. 615(3) clearly
26  would allow [trial counsel] to remain present in the courtroom as an exception to the exclusionary rule for
   witnesses.'"  *Milicevic v. Fletcher Jones Imports, Ltd.*, 402 F.3d 912, 915–16 (9th Cir. 2005) (internal
27  citations omitted).
        Ms. Singh has acted as one of the primary attorneys for the Horners throughout this case.  To
28  enable the Horners to present their objections to Debtor's Plan, it was essential that she remain present
   in the courtroom throughout the entirety of the evidentiary hearings.

U.S. Constitution to issue final orders and judgments regarding whether to confirm

Debtor's Plan.  *See Stern v. Marshall*, 564 U.S. 2 (2011).  In addition, venue is proper

under 28 U.S.C. §§ 1408(1) and 1409(a).

**5. DISCUSSION**

As explained below, Debtor did establish that he is an "individual with regular

income" sufficient to fund his proposed Plan, as required by § 109(e), and that his Plan

was feasible as required by § 1325(a)(6).  In addition, although Debtor's proposed

distribution to creditors was vanishingly small (two basis points), that did not establish a

lack of good faith if Debtor had proved that he could not afford anything more.

Indeed, it is fairly common in this district for plans to be confirmed with a 0%

dividend to nonpriority unsecured creditors when debtors can only afford to pay their

secured and priority claims.  Debtor alleged that, although his past income was high, his

current and projected income is low because he has lost his financial license.  In other

words his earning capacity allegedly is greatly reduced because he can only work in

capacities that do not require a financial license – *e.g.,* (a) by advising individual clients

whose wealth and trust in Debtor enable him to continue managing their money through

Strong Wealth Management, such as his mother, or (b) by working for an insurance

company, or a wealthy family as an in-house financial advisor, or a nonprofit charitable

foundation.  *See* Debtor Decl. (dkt. 175) pp. 12:25–13:8.

Debtor's assertions about his limited earning capacity are conceptually possible.

But Debtor's obligation from the inception of this case was to provide information – in

his bankruptcy schedules and in response to Creditors' discovery requests and this

Court's discovery orders – to meet his burden to prove his allegations.  In other words,

he had to show that he truly was proposing in his Plan to devote all of his projected

disposable income to paying his debts.  He failed to do that.

In fact, not only did Debtor fail to meet his burden to show this; he actively and

passively stymied Creditors' attempts to determine whether he truly is unable to pay

them more than a dividend of two basis points.  For these reasons, Debtor failed to

show that his Plan had "been proposed in good faith" as mandated by § 1325(a)(3). Consequently, this Court was required to deny confirmation.

**a. Debtor qualified as an "individual with regular income" who could feasibly fund the (paltry) payments under his proposed Plan**

To qualify for chapter 13 at all, Debtor must be an individual with regular income. § 109(e).  Under § 101(30), the term "individual with regular income" means "an individual whose income is sufficiently stable and regular to enable such individual <u>to make payments</u> under a plan under chapter 13 ...."  (Emphasis added.)  In addition, one of the requirements for confirmation is for Debtor to show that he "will be able to <u>make all payments</u> under the plan and to comply with the plan."  § 1325(a)(6) (emphasis added).

In this case, it is true that Debtor's current income from his profession does not appear to be substantial or stable, and he may well have periods of negative cash flow, absent contributions from his father.  The question has been whether his father's contributions enable Debtor to assert that he has enough "regular income" to qualify for chapter 13, and to make his proposed Plan feasible.

Debtor's evidence of contributions from his father did meet his *prima facie* burden of proof on these issues.  Between those contributions and Debtor's own (unreliable and small) income, Debtor appeared to be able to pay his ongoing monthly expenses and to fund his proposed Plan.

As for ongoing monthly expenses, the contributions from Debtor's father have taken the form of free rent, vacations, and funding tuition for Debtor's children, among other regular expenses.  In addition, Debtor's father apparently has been funding Debtor's ongoing litigation with Creditors, in both this bankruptcy case and in nonbankruptcy fora.

As for funding the Plan, it is true that there is no meaningful evidence of the father's assets and liabilities, or gross revenues, expenses, and net income.  But, as noted above, the father had set aside a separate bank account with $32,047.29 to

support the Plan, and the father had agreed to certain protections that assure those funds will be dedicated to paying creditors and would be sufficient to fund the (very small) dividend under the proposed Plan.[23]

In these circumstances, Debtor met his *prima facie* burden under §§ 101(30) and 109(e).[24] The authority cited by the Horners is better suited to a situation in which the contributor has not pre-funded the entire projected dollar amount needed to pay creditors.

Alternatively, even applying the traditional authority applicable when promised future contributions are being relied upon to fund a plan, Debtor qualified under that authority. The factors usually considered are:

> (1) the nondebtor's <u>relationship</u> to the debtor and motivation in making the contributions;
> (2) the nondebtor's <u>long and undisputed history</u> of making the contributions or otherwise providing support for the debtor;
> (3) the <u>unqualified commitment</u> of the nondebtor to make the contributions in a specific amount for the duration of the chapter 13 plan; and
> (4) the <u>financial ability</u> of the nondebtor to make the proposed contributions, including expenses and liabilities of the nondebtor that might take precedence over the contributions. [*In re Deutsch*, 529 B.R. 308, 313 (Bankr. C.D. Cal. 2015) (summarizing other decisions; emphasis added, citations omitted).]

---

[23] At the Preliminary Evidentiary Hearing, this Court determined that for the Plan to be feasible, it was necessary for the bank account to be accompanied by the following protections:

> (1) The bank account must be a trust account devoted exclusively to Plan payments (*i.e.,* even if Debtor has a shortfall in his monthly net income, he could not draw on this bank account to make up that shortfall);
> (2) The bank account must not reduced by an administrative expenses (*e.g.,* Debtor's attorney fees or other distributions, except to the extent that any such reductions would still leave enough in the account to fund all future payments to creditors under the Plan);
> (3) The bank account must not be an account from which the father can withdraw funds (until completion of all Plan payments); and
> (4) The bank account must not be an account that the father's own creditors could reach (until completion of all Plan payments).

Debtor's father testified at the Preliminary Evidentiary Hearing that he would agree to the foregoing protections.

[24] It is true that, if a hypothetical debtor were to turn out to have more projected disposable income than initially disclosed, the chapter 13 plan would have to be amended to provide larger payments. § 1325(b)(1)(B). But in that scenario the hypothetical debtor still would qualify under §§ 101(30) and 109(e) because that debtor would, by definition, have enough income to fund the increased plan payments.

The second factor – a "long and undisputed history" of contributions – is irrelevant because the father pre-funded a dedicated bank account that would have assured regular payments under the proposed Plan.  The third factor (an unqualified commitment from the nondebtor) was mooted – Debtor's father did not need to make any "commitment" to funding because he had already funded the Plan.  The other factors – Debtor's relationship to his father, and the father's financial ability to fund the Plan (which he had already done) – cut in Debtor's favor.

More generally, when "considering the effect of a promised family contribution" on the feasibility of a plan, "there are no hard and fast standards."  *In re Lee*, 655 B.R. 340, 353 (9th Cir. BAP 2023).  The upshot is that Debtor qualified for chapter 13 under § 109(e) and showed that he could make all payments under his proposed Plan and thus met the one confirmation requirement embodied in § 1325(a)(6).

In sum, Debtor showed that he was eligible to be in chapter 13 and that it was feasible for him to fund the very small distributions to creditors in his proposed Plan. Those things are different, however, from whether Debtor met his burden to show that he was devoting all of his projected disposable income to paying creditors (§ 1325(b)(1)(B)) and, if he was not proposing to do so, whether he was proposing his Plan in good faith. § 1325(a)(3).

### b. The Plan was <u>not</u> proposed in good faith

#### (i) Legal standards

##### (A) The scope of the "good faith" analysis

In the Ninth Circuit, the good faith analysis "includes" but is not limited to considering whether the following four circumstances exist:

> whether (1) the debtor has misrepresented the facts, manipulated the Bankruptcy Code or filed in an inequitable manner; (2) the debtor's history of bankruptcy filings; (3) the debtor intended to frustrate collection of a state-court judgment; and (4) "egregious behavior is present."  [*In re Welsh,* 711 F.3d 1120, 1123 (9th Cir. 2013) (citing and quoting *In re Leavitt,* 171 F.3d 1219, 1224 (9th Circuit 1999) (citations omitted)).  *See also Welsh* at 1127-30 (discussing history and breadth of good faith analysis).]

Not every one of the four above-quoted circumstances must be established. What matters is the totality of the circumstances. *In re Khan,* 846 F.3d 1058, 1066 (9th Cir. 2017).

In addition, the courts have developed other ways of articulating what it means to propose a plan in "good faith." One such test is "whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner." *In re Escarcega,* 573 B.R. 219, 241 (9th Cir. BAP 2017) (citation and internal quotation marks omitted; emphasis added). *See also Villanueva,* 274 B.R. 836, 841 (9th Cir. BAP 2002); *In re Broadbent,* 531 B.R. 840, 843-44 (Bankr. D. Idaho 2015); *In re Pasley,* 507 B.R. 312, 319 (Bankr. E.D. Cal. 2014); *In re Norwood,* 178 B.R. 683, 687-88 (Bankr. E.D. Pa. 1995) (noting that the precise "factors" used to evaluate good faith have "long been a source of dispute among the courts," but concluding that the inquiry "still has at its heart" whether "there has been an abuse of the provisions, purpose, or spirit of Chapter 13 in the proposed plan") (citations and internal quotation marks omitted; emphasis added).[25]

One of the provisions of the Bankruptcy Code that a debtor must not "unfairly manipulate[]," and as to which he must not "misrepresent[] facts," is the mandate to propose a plan that will pay creditors "all of the debtor's projected disposable income

---

[25] This Court is also mindful that, under the language of § 1129(a)(3) that is identical to the language of § 1325(a)(3), the Court of Appeals for the Ninth Circuit has held that the statute "directs courts to look only to the proposal of a plan, not the terms of the plan." *Garvin v. Cook Investments NW, SPNWY, LLC,* 922 F.3d 1031, 1035 (9th Cir. 2019) (emphasis added, citations omitted). On the one hand, this Court believes that the same interpretation should apply to the identical statutory "good faith" test under § 1325(a)(3).

On the other hand, *Garvin* added, "[c]ases directing courts to look to the 'totality of the circumstances' to determine whether a plan was proposed in good faith do not change the analysis here," and courts must still "determine whether the plan achieves a result consistent with the objectives and purposes of the Code." *Id.* at 1036 n. 3 (citations omitted; emphasis added). Accordingly, this Bankruptcy Court interprets *Garvin* as refining but not changing the analysis. The decisions interpreting § 1325(a)(3), cited above, continue to be applicable. *See, e.g., In re Orange Co. Bail Bonds, Inc.,* 638 B.R. 137, 147 (9th Cir. BAP 2022) ("Under the good faith prong of § 1129(a)(3), courts must determine whether the plan achieves a result consistent with the objectives and purposes of the Code.") (internal quotation marks omitted; citing *Garvin* and other Ninth Circuit authority).

…" (if any creditor objects to confirmation).  § 1325(b)(1)(B) (emphasis added).[26]  This requirement is the lynchpin of the chapter 13 bargain: in contrast to Chapter 7, in which a discharge comes at the "steep price" of the "prompt liquidation of the debtor's assets," under Chapter 13 a debtor may obtain a discharge <u>and</u> "retain his property if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period," and then subsequently makes all payments required under the confirmed plan.  *Harris v. Viegelahn*, 575 U.S. 510, 514 (2015).

It was Debtor, not Creditors, who had the initial burden (once Creditors objected) to show that he had proposed a plan that would pay all of his "projected disposable income," based on a good faith projection of such income.  § 1325(b)(1)(B).  In meeting that burden, Debtor has an obligation to provide full, candid, and complete disclosures of his finances.  "[T]he viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs."  *In re Searles*, 317 B.R. 368, 378 (9th Cir. BAP 2004), *aff'd,* 212 F. App'x 589 (9th Cir. 2006).

Put another way, at the heart of the tradeoff under which a chapter 13 debtor may simultaneously obtain a discharge and retain property is the debtor's burden to show that all projected disposable income will be devoted to paying creditors.  That burden starts with bankruptcy Schedule "I" and continues through confirmation of a proposed plan.

Line 8a of bankruptcy *Schedule I: Your Income* (Official Form 106I) directs debtors to list "[n]et income from … operating a business."  It also directs debtors to "[<u>a</u>]ttach a statement for each … business showing gross receipts, ordinary and necessary business expenses, and the total monthly net income."  (Emphasis added.) In addition, the bottom of bankruptcy Schedules I and J (Official Forms 106I & 106J) direct debtors to state whether the expect any increase (or decrease) within the year after filing the form.

---

[26] A plan may also be confirmed if it provides for a stream of payments that, when discounted to present value, are sufficient to pay an objecting creditor's claim in full, § 1325(b)(1)(A).  That alternative obviously does not apply here, as Debtor's plan proposes a dividend of only 0.02% to objecting to creditors.

In addition to Schedule I's snapshot of alleged disposable income as of the petition date, and projection as to the next year, prior years' income is supposed to be disclosed in a debtor's Statement Of Financial Affairs ("SOFA," Official Form B 107). When, as in this case, there is a large disparity between high historical income and low alleged current and projected income, creditors often seek discovery including historical financial and tax records.

In this case, it is relevant to the good faith analysis that on July 20, 2022, Debtor stipulated with the Horners to appear for an examination under Rule 2004 (Fed. R. Bankr. P.) and to produce (subject to a privilege log) a range of documents relevant to the calculation of gross receipts, ordinary and necessary business expenses, and the determination of net monthly and yearly income on a historical, current, and projected basis.  *See* Stipulation (dkt. 38).  This Court issued an order directing Debtor to comply with that stipulation.  *See* Order (the "Rule 2004 Order," dkt. 40).

It is also relevant to the good faith analysis that Creditors made a request to Debtor to produce information required by § 521(a)(4), which provides in relevant part:

> (f) At the request of the court, the United States trustee, or any party in interest in a case under chapter 7, 11, or 13, a debtor who is an individual shall file with the court—
> * * *
> (4) in a case under chapter 13—
> > (A) on the date that is either 90 days after … 1 year after the date of the commencement of the case … [*i.e.,* one year plus 90 days after June 1, 2022, which is <u>August 30, 2023</u>];
> > * * *
> <u>a statement, under penalty of perjury, of the income and expenditures of the debtor during the tax year</u> of the debtor most recently concluded before such statement is filed under this paragraph, <u>and of the monthly income of the debtor</u>, that <u>shows how income, expenditures, and monthly income are calculated</u>.
> [§ 521(f)(4) (emphasis added).]

Under each of these alternative disclosure obligations – (I) Schedules I and J, (II) this Court's Rule 2004 Order, and (III) § 521(f)(4) – it was Debtor who had the obligation to explain his finances to Creditors.  In particular, Debtor was required to respond fully and accurately to questions about his finances at his Rule 2004

examinations, and he was required to "show[] how" (§ 521(f)(4)) he calculated his gross

income, expenditures, and net income.

The centrality of a debtor's duty to provide meaningful disclosures and

explanations, not obfuscation, has been articulated in a different context by *In re Martin*,

698 F.2d 883, 888 (7th Cir. 1983) (involving the analogous situation of denial of a

discharge for inadequate records and explanations under § 727(a)(3)&(5)):

> The speculation of the bankruptcy judge or the creditors as to what may
> actually have been occurring is not an adequate substitute for a believable
> explanation by the debtor.  The evidence in this case which could
> satisfactorily explain the events in question is far more likely to lie in the
> hands of a debtor than of the creditor.  The debtor presumably knows why
> what is usually a simple matter … has taken on such a byzantine
> character.  To the extent that the debtor can explain these events he has
> an obligation to come forward and do so—he cannot abuse the
> bankruptcy process by obfuscating the true nature of his affairs and then
> refusing to provide a credible explanation.  [*In re Martin*, 698 F.2d 883,
> 888 (emphasis added).]

In sum, "good faith" under § 1325(a)(3) includes Debtor's obligations, on multiple

grounds, to provide both historical and projected profit and loss statements, supporting

financial documents, and documents and testimony showing how gross receipts,

expenditures, and net income is calculated.  Those disclosures should have been clear

by themselves, but if they were not (as in this case) then Debtor had obligations to

explain them.

### (B) Limitations on the "good faith" analysis

Although the "good faith" analysis is broad, it must not be used as a "back door"

means of applying a different measure of "disposable income" from what Congress has

mandated.  The Court of Appeals for the Ninth Circuit has confirmed that "consideration

of [an allegedly too small dollar amount of] disposable income – now defined in great

detail by Congress – has no role in the good faith analysis."  *Welsh,* 711 F.3d 1120,

1132–33 (emphasis added).

The necessary implication of this authority is that, as Debtor puts it, "[w]hat is not

to be counted in Debtor Strong's disposable income is (a) his father's house, (b) his

father's wealth, (c) what vacations Debtor goes on with his family, (d) who pays for his

legal fees, or (e) his upbringing."  Debtor Confirmation Brief (dkt. 184) pp. 5:27–6:1

(emphasis added).  This Court agrees.

But Debtor is placing too much weight on *Welsh* to the extent, if any, that he is

relying on it to defeat his creditors' objections without a broader inquiry into his good

faith.  The questions presented in *Welsh* were specific.  One was whether payments of

secured debts that were <u>permissible</u> under Congress' calculation of "disposable income"

nevertheless could be <u>impermissible</u> under the "good faith" test.  The Ninth Circuit held

that the "good faith" test could not be used in that manner.  *Welsh,* 711 F.3d 1120.

Another question was whether social security income, even though <u>not</u> included

in the statutory calculation of disposable income, could nevertheless be included for

purposes of the "good faith" test.  Again, the good faith test could not be used that way.

*Welsh,* 711 F.3d 1120.

This case involves different issues, as reflected in the fact that *Welsh* agreed with

the arguments of the trustee in that case that "good faith" still encompasses a broad

range of issues <u>different from</u> the "disposable income" test:

> The Trustee urges us to "determine that the good faith test and the
> disposable income test <u>serve two different purposes</u>," and, therefore, "they
> must be <u>read separately</u>."
> <u>We agree with the Trustee's contentions</u>, but disagree that it leads
> to the conclusion that the good faith inquiry can encompass
> considerations of what income, and how much income, a debtor is
> devoting to the proposed plan.  [*Welsh,* 711 F.3d 1120, 1132 (footnotes
> omitted; emphasis added).]

In this case, unlike *Welsh*, Creditors are not challenging Debtor's payment of any

secured debts or the other <u>elements</u> of how to calculate disposable income (which

Congress has mandated) but rather whether Debtor has provided <u>support</u> for his own

calculations of historical, current, and projected disposable income.  In addition,

Creditors argue that Debtor fails each of the four non-exclusive factors described in

*Leavitt.*

### (C) Summary of the law on "good faith"

Under *Welsh*, *Leavitt* and the other authorities interpreting "good faith," this Bankruptcy Court has a duty to consider all facts and circumstances except "considerations of what income, and how much income, a debtor is devoting to the proposed plan" in any way different from the formulas mandated by Congress. *Welsh,* 711 F.3d 1120, 1132; *Leavitt,* 171 F.3d 1219.  The legitimate "good faith" issues that this Court must examine include Creditors' assertions that Debtor has:

    1) engaged in misrepresentations and inequitable manipulation of the Bankruptcy Code (Horner Brief in Opposition to Confirmation (dkt. 178) at pp. 10:1–14:25);

    2) filed bankruptcy cases at times chosen to maximize the expense, delay, and hindrance to his creditors (*id.* at pp. 14:26–16:7);

    3) frustrated the finalization and collection of judgments and awards from nonbankruptcy fora (*id.*); and

    4) engaged in "egregious" conduct (*id.* at p. 11:8–12 and *passim*).

More broadly, this Court must consider whether Debtor "has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner." *Escarcega,* 573 B.R. 219, 241.  This includes whether Debtor has failed to live up to his obligations to provide both historical and projected profit and loss statements, supporting financial documents, and documents and testimony explaining how gross receipts, expenditures, and net income are calculated.

### (ii) Applying the "good faith" law to the facts of this case

Throughout this case, Debtor has consistently and repeatedly failed to furnish sufficient financial information to all of his creditors, particularly the Horners.  Of course, sometimes a debtor offers a potentially plausible explanation that future income cannot be expected to match past income due to a change in circumstances – in this case Debtor points to difficulties obtaining work in the wealth management field given the

harm to his reputation caused by the Horners' $7.8 million State Court Judgment and Mr. Vosicher's $150,000 FINRA arbitration award.  But that is not an excuse to fail to provide, or to obscure, past finances.  To the contrary, any possible uncertainty about Debtor's earning capacity was all the more reason why he needed to be candid about his past and present finances, so that Creditors could examine both his past level of earnings and his potential for future earnings, as well as any attempts to hide income or intentionally minimize income.

Instead Debtor stonewalled Creditors, who were unnecessarily required to expend substantial funds coercing Debtor's compliance with his obligations under the Bankruptcy Code.  After multiple requests by the Horners, Debtor did belatedly produce some of the information that should have been promptly provided, but even this untimely production was inadequate.

The Schedule I that Debtor filed at the onset of the case listed his occupation as the "[m]anaging [m]ember" of Strong Wealth Management[27] and indicated that Debtor's total monthly income was $2,164.00,[28] consisting of $1,964.00 from operating Strong Wealth Management[29] and $200.00 from "[f]amily [s]upport [w]hen [n]eeded."[30]  But Debtor failed to include the required statement "showing gross receipts, ordinary and necessary business expenses, and the total monthly net income" from operating Strong Wealth Management.

Ordinarily a debtor has only 14 days after the petition date to file fully complete bankruptcy schedules.  That period can be extended (Rule 1007(c)), but Debtor never requested an extension, and in any event the undersigned Bankruptcy Judge cannot recall ever extending the total period longer than approximately one month, particularly

---

[27] Schedule I (dkt. 1 at PDF pp. 35–36) at ¶ 1.
[28] *Id.* at ¶ 9.
[29] *Id.* at ¶ 8(a).
[30] *Id.* at ¶ 8(h).

when, as in this case, there has been a prior bankruptcy case in connection with which

the debtor should have been compiling the same financial information.[31]

Not until October 28, 2022, almost five months after the Petition Date of June 1,

2022, did Debtor produce to the Horners what purported to be the required statement of

gross revenues, expenses, and calculation of net income.  But as set forth below that

statement was only provided after repeated requests, and it was inadequate.

The Horners conducted a Rule 2004 examination of Debtor on August 15,

2022.[32]  The Horners brought to Debtor's attention the fact that he had failed to produce

certain documents to creditors:

> **Question by Horners' Counsel:** Do you recall attending the
> creditor meeting on July 1st, 2022?
> **Debtor's Answer:** I do.
> **Question by Horners' Counsel:** And do you recall that the
> Chapter 13 trustee's counsel requested that certain documents be
> produced, such as <u>tax returns</u>, <u>a scheduled [sic] statement of business
> net income</u>, [etc.]?
> **Debtor's Answer:** Yes, I do.
> **Question by Horners' Counsel:** And do you also recall that the
> creditors who attended who were at least participating by phone also
> asked for copies of those documents? …
> **Debtor's Answer:** Yeah, I recall a number of creditors saying I
> would like a copy of those documents as well, yes.
> **Question by Horners' Counsel:** Have you produced the
> documents that the Chapter 13 trustee's counsel requested?
> **Debtor's Counsel's Answer**: That's – we are taking care of that.
> We haven't turned over everything that they wanted, so since the
> confirmation's continued we have some more time….
> **Question by Horners' Counsel:** Mr. Strong, have you seen
> Exhibit 3 previously?
> **Debtor's Answer:** I have.
> **Question by Horners' Counsel:** And have you produced – excuse
> me, to the Chapter 13 trustee or the Chapter 13 trustee's counsel any of
> the documents described in Exhibit 3?

---

[31] Case No. 2:22-bk-10689-NB (filed on February 8, 2022 and dismissed on February 24, 2022).  Debtor
states that he voluntarily dismissed the prior case because it was filed prematurely, before Debtor's
marital dissolution proceeding had been concluded.  Debtor's Decl. (dkt. 59 at PDF pp. 16–20) at ¶ 4.
The Horners suggest that he dismissed his prior case because it had served its purpose of disrupting
their litigation.
[32] Dkt. 40.

**Debtor's Answer:**  Again, I will be turning it over to the trustee before the next confirmation dates.  So the answer is no. [Aug. 15, 2022 Rule 2004 Examination Tr. at 17:20–19:16.]

At the conclusion of the August 22, 2022 Rule 2004 examination, Debtor agreed to produce various documents to the Horners by no later than September 9, 2022, including business and personal tax returns for the 2019–2021 tax years.[33]  Debtor failed to produce the documents by the agreed-upon deadline.[34]  After the Horners' counsel sent Debtor's counsel several follow-up e-mails, Debtor produced some, but not all, of the missing documents on September 14, 2022, September 21, 2022, and October 10, 2022.[35]  Notably, however, Debtor failed to produce his personal tax returns or tax returns for his investment advisory business, Strong Wealth Management.[36]

On October 6, 2022, the Horners filed a motion to dismiss Debtor's chapter 13 case, in which they argued, among other things, that Debtor had acted in bad faith by failing to produce financial information, including a profit and loss statement for Strong Wealth Management and his personal and business tax returns.[37]  On October 28, 2022 – five days before the hearing on the Horners' motion to dismiss – Debtor for the first time produced a profit and loss statement for Strong Wealth Management.[38]  This Court emphasizes that the Horners should not have been required to litigate to compel Debtor to disclose information that should have been included in the Schedule I that Debtor filed at the inception of the case.  "Creditors should not have to 'drag the truth' from the debtor and the debtor should be required to abide by the 'cardinal rule: when in doubt, disclose.'"  *In re Kinsale*, 617 B.R. 58, 68 (Bankr. D.S.C. 2020) (internal citation omitted).

On November 10, 2022, this Court issued an interim order granting in part the relief sought by the Horners in the motion to dismiss.  Specifically, this Court ordered

---

[33] Aug. 15, 2022 Rule 2004 Examination Tr. at 78:14–83:14.

[34] Singh Decl. (dkt. 171) at ¶ 6.

[35] *Id.*

[36] Ex. C (e-mail from Debtor's counsel to Horner's counsel, stating that Debtor objected to producing his personal and business tax returns).

[37] Dkt. 54 at pp. 8–9.

[38] Horner Ex. F (Strong Wealth Management profit and loss statement); Singh Decl. (dkt. 171) at ¶ 7(d) (testimony by Horners' counsel as to the date of production).

Debtor to produce his personal and business tax returns to the Horners no later than

November 23, 2022, but declined to dismiss the case.[39]  As explained on the record at

the hearing on the motion to dismiss, this Court determined that it was necessary for

Debtor to produce the tax returns as well as a revised profit and loss statement in order

to rebut the Horners' *prima facie* showing that the petition had been filed in bad faith.

This Court took care to note that its decision to allow Debtor to continue to proceed in

bankruptcy did <u>not</u> prevent the Horners from raising the issue of bad faith in connection

with the confirmation hearing:

> Third, this Court distinguishes the issues at this stage from other issues
> that might arise later in this case.  As stated in the concurrence in *In re
> Ho,* if the case is not dismissed on the present motion, the issue of good
> or bad faith can be properly revisited at the plan confirmation stage, at
> which time the burden will be on Debtor to establish, *inter alia,* that the
> plan has been proposed in good faith.  § 1325(a)(3); *In re Ho,* 274 B.R.
> 867, 883.  In addition, if Movants' allegations of wrongdoing are correct,
> they might be able to establish nondischargeability.  *See* §§ 523, 1328.
> But those confirmation and dischargeability issues are not presently
> before this Court.  [Adopted Tentative Ruling issued on November 3, 2022
> (formatting and citations cleaned up).]

On December 8, 2022, Debtor produced to the Horners purportedly revised profit

and loss statements.[40]  On January 6, 2023, the Horners' counsel advised Debtor's

counsel that the purportedly revised profit and loss statements were nothing more than

a monthly breakdown of the defective profit and loss statement that had been previously

produced, and as such did not resolve the core problem – the fact that Debtor's profit

and loss statements could not be reconciled with his bank statements.[41]

On February 17, 2023, the Horners conducted a continued Rule 2004

examination of Debtor.  At the examination, the Horners again emphasized to Debtor

---

[39] Dkt. 73 at ¶ 4.
[40] Singh Decl. (dkt. 171) at ¶ 7(f).
[41] *Id.*

and his counsel that there were material inconsistencies between the bank statements

and profit and loss statements:

> **Question by Horners' Counsel:** Our analysis of the banker statements and the profit and loss statement indicates that the income shown on the profit and loss statement is lower than the deposit into the bank accounts by approximately $47,000 for the period between January and June 2022.  Do you have an explanation for the difference in figures?
> **Debtor's Answer:** I don't know. I mean, I rely on Quickbooks for this….
> **Question by Horners' Counsel:** The deposits that show on the bank statements are approximately $75,000….  But the income as shown on the profit and loss statement, Exhibit 29, is $28,516.61. The question is, what's the difference consist of and where did the extra money go?
> **Debtor's Answer:** Yeah.  I don't know at this time.  <u>I'll look into this</u>.
> **Question by Horners' Counsel:** Similarly, the expenses on the profit and loss statement are higher than what's withdrawn from the bank accounts by approximately $40,000. And I'll tell you exactly what our analysis shows. The bank statement shows withdrawals of approximately $77,000, but the expenses on the profit and loss statement are $117,555.30.  So the question is, how do you explain the difference?
> **Debtor's Answer:** Yeah. I relied on Quickbooks, and I've not seen your analysis that you referenced, so I can't speak to something that you guys did to calculate that difference.  [Feb. 17, 2023 Rule 2004 Examination Tr. at 133:20–135:9 (emphasis added).]

On February 22, 2023, the Horners' counsel e-mailed Debtor's counsel a detailed

list of numerous discrepancies between Debtor's bank statements and his profit and

loss statements.[42]  Although Debtor's counsel represented to the Horner's counsel on

March 21, 2023 that the discrepancies would be explained, the Horners never received

any additional documentation or communication from Debtor providing such an

explanation.[43]

Debtor also waited until October 26, 2023 – one week after the Horners had filed

an objection to confirmation of Debtor's Plan – to provide the Horners profit and loss

statements covering Strong Wealth Management's operations subsequent to January

2023 (the profit and loss statements previously produced only covered the period

---

[42] Singh Decl. (dkt. 171) at ¶ 7(g) and Horner's Ex. L.
[43] *Id.* at ¶ 7(h) and Horner's Ex. M.

between January and June 2022).[44]  The Chapter 13 Trustee's counsel subsequently advised the Horners' counsel that the Chapter 13 Trustee had received updated financial statements from Debtor approximately one month prior to the plan objection deadline – showing that Debtor's failure to produce the updated information to the Horners was a deliberate attempt by Debtor to impede the Horners' ability to challenge confirmation of Debtor's Plan.[45]

The updated financial information Debtor belatedly provided to the Horners suffered from numerous deficiencies.  First, Debtor produced what he characterized as a profit and loss statement covering the operations of Strong Wealth Management for the period between January 2023 and August 2023.[46]  The profit and loss statements that Debtor had previously produced to the Horners in October and December 2022 were deficient because Debtor failed to adequately explain how those statements could be reconciled with the underlying bank statements.  Notwithstanding this material omission, the October/December 2022 profit and loss statements did contain an itemization of the income and expenses of Strong Wealth Management.  By contrast, the purported profit and loss statement produced in October 2023 was nothing more than a table showing the deposits and withdrawals from Strong Wealth Management's checking and savings account, with the difference between the deposit and withdrawal amounts listed as net income.  The statement failed to include any of the information that would customarily be included in a profit and loss statement – such as line items for gross revenue, gross profit, cost of revenue, interest expense, and the like.  In other words, what Debtor claimed to be a profit and loss statement was in fact nothing of the sort.

Second, the figures on the statement do not even match up with the corresponding bank statements upon which it is based.  For example, for the month of August 2023, the statement lists checking deposits of $2,734.35 when the actual

---

[44] *Id.* at ¶ 7(k).
[45] *Id.*
[46] Horner Ex. Q.

checking deposits as shown on the bank statement were only $2,000.00, and lists

savings deposits of $5,449.30 when the actual savings deposits per the bank statement

were only $4,599.81.[47]  Comparable discrepancies exist for almost all the months

covered by the statement.[48]

Debtor's cavalier approach to the Horners' requests for financial information is

best illustrated by the cursory explanation presented in declaration testimony filed in

support of the Plan, which was devoid of specific detail and attempted to shift the

burden and costs of reconstructing Debtor's financials to the Horners:

> One of the things that came up during my examination with the Horner's and the Chapter 13 trustee is why the profit and loss statements that I turned over did not fully reconcile with the bank statements.
> I can easily explain this here and I have explained it, in detail with document support, to the Chapter 13 Trustee and the Horners.
> Every business owner does their accounting differently depending on the industry: the way a roofing contractor does his accounting will differ from that of a dentist. Similar here, the way my business, Strong Wealth Management, operates differs than other businesses – but what remains true and concrete is that all of the income, expenses and financial information is disclosed and was made readily available when I turned over all of my bank statements, profit and loss, the financing statements from Strong Wealth Management and my private returns (both personal and business).
> If I was trying to "hide" something, I could not do so because it was all laid out in the open for the Trustee and the Horners to see.
> With that said, I will now clarify why my profit and loss does not match my bank statements.
> Interactive Brokers is the custodian of funds and broker platform that I used to execute trades. The fees and transactions on Interactive Brokers would reflect on the following month's statements. This was a ***combined accrual and cash basis accounting***. For example, if in the month of January I would have transactions, the fees would post to my advisory master account on February 1st or 2nd. Because I would use accrual accounting, <u>I would need to go back and manually journal those fees retroactively on Quickbooks to the month of January so it would reconcile</u>.
> The documents from Interactive Brokers and transaction history was all provided to the Horners and the Trustee.  With respect to the bank statements and profit and loss through my Quickbooks, I turned over all bank statement requested and the accompanying profit and loss.

---

[47] Singh Decl. (dkt. 171) at ¶ 12(a) and Horner's Exs. Q and R.
[48] *Id.*

Questions came up from the Horners or the Trustee why they do not match.

I explained it to my attorney, who them provided the explanation in different emails dated December 8, 2022, again on March 21, 2023 and again on October 26, 2023….

My father would give a loan to my entity, Strong Wealth Management, which was for funds that he used to cover my legal fees and other expenses. The income and deposits plus the expenses and expenditures on the profit and loss would be around $85,000 which matched the approximate $85,052 that my dad lent to my company.

My father would give a loan to my company and the funds would be drawn down to pay for expenses.

Not all deposits on the bank statements are categorized as "income" for purpose of my profit and loss. For example, just as a hypothetical, if there is an Amazon refund that would be on the bank statement – the "-$25" credit is not categorized as "income" for profit and loss purposes because it is not income.  Similar to my situation, not all of the deposits on my bank statements are "income" and not every withdrawal on my bank statement was an "expense."  The individual entries for each transaction [were] disclosed and properly identified. [Debtor Decl. [dkt. 175] at ¶¶ 20–33 (paragraph numbering omitted, emphasis added).]

Debtor's declaration testimony shows that he fundamentally misapprehends his obligations as a fiduciary to creditors.  Debtor holds an MBA from the USC Marshall School of Business,[49] and he worked at Merrill Lunch, Advantage Partners, and Morgan Stanley before founding his own wealth management firm.[50]  If anyone is capable of reconciling a profit and loss statement with a bank statement, it is Debtor.  It is not incumbent upon creditors to incur the time and expense of attempting to conduct a forensic accounting, untangle Debtor's "combined accrual and cash basis accounting," whatever that means (quoted above), and unearth Debtor's true financial picture from thousands of pages of bank statements.  Debtor has failed to provide a reliable and verifiable accounting of the performance of his business.  To paraphrase, creditors "are not like pigs, hunting for truffles buried" in disorganized financial data.  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

It is not necessary for this Court to exhaustively itemize every shortcoming in Debtor's financial disclosures, as a description of the more serious omissions

---

[49] Aug. 15, 2022 Rule 2004 Examination Tr. at p. 8:17–18.
[50] *Id.* at p. 9:6–18.

1  sufficiently illustrates the yawning gap between Debtor's actual disclosures and the

2  required standard.  But in addition to the deficiencies discussed above, certain other

3  shortcomings are worth highlighting.  First, in response to legitimate concerns raised by

4  the Horners over their inability to reconcile Debtor's profit and loss statements with his

5  underlying bank statements, Debtor offered only the conclusory statement that "not all

6  of the deposits on my bank statements are 'income' and not every withdrawal on my

7  bank statement was an expense.'"[51]  Improperly attempting to shift the costs of

8  disclosure onto the Horners, Debtor then went on to assert that the Horners "could have

9  asked for more details and explanation and I would have happily provided it."[52]  But the

10 Horners did ask for more details and explanation, and Debtor did not provide it.

11        Debtor's approach is also backwards – it is Debtor who "has an obligation to

12 come forward" and explain his financial situation, and Debtor "cannot abuse the

13 bankruptcy process by obfuscating the true nature of his affairs and then refusing to

14 provide a credible explanation."  *In re Martin*, 698 F.2d 883, 888 (7th Cir. 1983).  Debtor

15 should have provided disclosures to the Horners that would have enabled them to easily

16 validate whether the figures on Debtor's profit and loss statement were consistent with

17 the figures on his bank statements.[53]  The disclosures Debtor did provide precluded the

18 Horners from conducting such a validation without performing a costly forensic

19 examination of the bank statements.  Indeed, it is questionable whether even a forensic

20 accountant would have been able to validate the profit and loss statements, because

21 many of the entries on the supporting bank statements Debtor produced are online

22 transfers from other accounts, and Debtor failed to specify the source of the transferred

23 funds.

24        Debtor had a final opportunity to rectify his inadequate disclosures in testimony

25 provided at the evidentiary hearings conducted by this Court on Plan confirmation.

26 Unfortunately, Debtor elected not to avail himself of this opportunity.  Debtor failed to

27 ---
[51] Debtor Decl. (dkt. 175) at ¶ 33.

[52] *Id.* at ¶ 35.

28 [53] As noted above, such disclosures were required by Debtor's obligation to properly complete Schedule I, this Court's discovery orders, and by § 521(f)(4).

provide the type of detailed, plausible explanation for the discrepancies between the profit and loss statements and the underlying bank statements that would be expected from someone possessing his education and experience.  Debtor instead attempted to blame the Horners for supposedly failing to take full advantage of Rule 2004 discovery.  Once again, Debtor's approach attempts to turn the bankruptcy system upside down – it is <u>Debtor</u> who is obligated to provide full and forthright disclosures in exchange for receiving the benefits of chapter 13, and creditors should not be forced to incur significant effort or cost simply to compel a recalcitrant debtor to adhere to his statutory obligations.

As explained earlier in this Memorandum Decision, the payment of all disposable income to creditors under a confirmed plan is the price a chapter 13 debtor must pay for the privilege of simultaneously obtaining a discharge and retaining his property.  Here, Debtor's inadequate disclosures prevented the adversary process from functioning properly by depriving objecting creditors of the information necessary to meaningfully test whether Debtor had satisfied the disposable income requirement.  Debtor did not even provide creditors a profit and loss statement for Strong Wealth Management covering the period of January to August 2023: what he produced was nothing more than a summary of the deposits and withdrawals on Debtor's bank accounts, and even that summary was not accurate.  The profit and loss statements for Strong Wealth Management that Debtor did provide covered only the limited period of January to June 2022 and could not be validated because Debtor failed to supply the disclosures or explanation necessary to tie the figures on those statements to the supporting bank statements.  Compounding these very serious omissions, the materially deficient disclosures Debtor did provide came only after substantial delay, multiple requests made by the Horners, and the Horners' motion to dismiss Debtor's case.  "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight."  *In re Colston*, 539 B.R. 738, 748 (Bankr. W.D. Va. 2015) (internal quotations and citation omitted).  For all these reasons, this

1    Court is compelled to find that Debtor's plan was not proposed in "good faith."

2    § 1325(a)(3).

3        In addition to all of the lack of financial disclosure (described above and in

4    Creditors' filed papers and trial exhibits), Creditors point out how Debtor's prior

5    bankruptcy case and this current bankruptcy case were filed at times that caused critical

6    disruption to their nonbankruptcy litigation.  *See, e.g.,* Lieb Decl. (dkt. 172).  Debtor

7    offers excuses, but this Court finds that the principal reason for the timing was to inflict

8    maximum disruption on Creditors, and to frustrate Creditors' ability to liquidate and

9    collect their claims.

10       Based on all of the foregoing this Court concludes that Debtor has exhibited not

11   just some of the grounds for finding a lack of good faith but every single one of those

12   grounds as typically articulated in the reported decisions.  Debtor has "misrepresented

13   the facts" by greatly delaying any meaningful financial disclosures, and then very

14   belatedly providing incomplete and opaque financial information, despite multiple

15   different obligations to provide such disclosures and information.  *Welsh,* 711 F.3d

16   1120, 1123 (citations and internal quotation marks omitted).  Debtor has attempted to

17   "manipulate[] the Bankruptcy Code" (*id.*) and has filed his bankruptcy petition and

18   proposed Plan "in an inequitable manner" (*id.*) by pleading poverty, and alleging an

19   inability to earn projected disposable income greater than what would support a two-

20   basis-point Plan, while failing to provide remotely adequate support for that alleged lack

21   of earning power.  Debtor has a history of bankruptcy filings that this Court has found

22   were timed to cause maximum disruption to nonbankruptcy litigation.  *See id.*  Debtor

23   has intended to frustrate liquidation and collection of Creditors' claims.  *See id.*  Finally,

24   Debtor has engaged in "egregious behavior" (*id.*), and an "abuse of the provisions,

25   purpose, [and] spirit of Chapter 13 in the proposed plan" (*Norwood,* 178 B.R. 683, 687-

26   88 (citations and internal quotation marks omitted)), by his repeated failures and

27   refusals to provide meaningful financial disclosures and information, the timing of his

28   bankruptcy petitions and postpetition discovery, and his attempts to blame Creditors for

not being able to untangle his "combined accrual and cash basis accounting" (dkt. 175, ¶ 21) and his incomplete profit and loss statements that did not match his bank records.

**6. CONCLUSION**

Debtor has amply demonstrated his utter lack of "good faith" in proposing his Plan.  Having demonstrated his lack of trustworthiness and his willingness to frustrate discovery into whatever his true financial history or prospects might be, no amended Plan could cure his lack of good faith.

###

Date: June 28, 2024

Neil W. Bason
United States Bankruptcy Judge